# US DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION-DETROIT

**UNITED STATES OF AMERICA**

                    **Plaintiff,**

**v.**                                                          **Case No. 18-20698**
                                                          **Hon. Arthur Tarnow**

**KEVIN RAYMOND STROUD.**

                    **Defendant.**

_____/

UNITED STATES ATTORNEY              AMBERG & AMBERG, PLLC
Andrew Picek                        James W. Amberg (P68564)
Attorneys for the Government        Attorneys for Mr. Stroud
211 W. Fort Street, Suite 2001      32121 Woodward Ave. Ste PH
Detroit, MI                         Royal Oak, MI 48073
313.226.9100 office                 248.681.6255 office
                                    248.681.0115 fax
                                    www.amberglaw.net
_____/

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVE. STE PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET
(248) 681-6255

### SENTENCING MEMORANDUM

Now comes Kevin Stroud, by his attorney, James Amberg, and respectfully submits this sentencing memorandum to the Court.  Mr. Stroud pled guilty to two counts, both involving his possession of a firearm as a convicted felon.  Mr. Stroud's Presentence Report indicates a guideline range of 78-97 months incarceration, while Mr. Stroud argued his proper guideline scoring should be 51-63 months.  Since this plea, there has been precedent which may affect the guideline range, as will be discussed below.  With this change, it is argued that Mr. Stroud's guidelines will be 27-33 months, while the Government will contend they are 41-51 months.

An additional purpose of this memorandum is to shed light on Mr. Stroud's life history, character, and hope for the future.  Ultimately, Mr. Stroud will request a below-guidelines sentence at sentencing.

### PART ONE-STATEMENT OF THE CASE

Mr. Stroud stands before the Court for possessing firearms while being a convicted felon.  These pleas stemmed from two separate incidents in which Mr. Stroud possessed a stolen firearm.  In the first case, Mr. Stroud was going to his barbershop when he was approached by officers on the street, who quickly placed him under arrest and searched him, discovering a handgun.  It is important to point out that Mr. Stroud was doing nothing illegal outside of the gun possession.

While awaiting motion arguments on the aforementioned gun possession case, Mr. Stroud was involved in a very serious vehicle accident, due to ice on the road, as he drove home from performing a drywall job.  The result of this accident were numerous serious injuries to Mr. Stroud, including broken bones and a clot in his lung.  As to the police involvement, a baggie containing just over half a gram of heroin was discovered.  Additionally, Mr. Stroud had a gun in the vehicle.  Also discovered were a plethora of lottery tickets, which is not surprising as Mr. Stroud is a frequent lottery player.

After receiving the second charge, Mr. Stroud decided to withdraw his motion in the first case and plead guilty.  Now he awaits sentencing.

### PART TWO-OBJECTIONS TO PRESENTENCE REPORT

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVE, STE PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

As the Government points out in its Sentencing Memorandum, *United States v Havis*, 927 F3d 382 (6th Cir 2019) was released after Mr. Stroud's plea. Noting their objection that *Havis* was wrongfully decided, the Government indicates that the reasoning of *Havis* could arguably be extended to Mr. Stroud's prior conviction for drug conspiracy, which would result in a guideline score of 41-51 months, as USSG §2k2.1(A)(6) requires a base level of 14.

The only objection to the Presentence Report involves the application of USSG §2K2.1(b)(6)(B). This objection was contemplated in the Rule 11 Plea Agreement and it is contended that it is error to score Mr. Stroud with an additional 4 points for possessing a firearm in connection with another felony. If the Court finds this argument to ring true, then Mr. Stroud's guideline range will be 27-33 months. USSG §2K2.1(b)(6)(B) states that:

> "If the defendant used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, increase by 4 levels." *Id*

Application Note 14, Application When Other Offense is Burglary or Drug Offense, indicates that USSG §2K2.1(b)(6)(B) applies:

> "in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia. In these cases, application of subsections (b)(6)(B) and, if the firearm was cited in the offense of conviction, (c)(1) is warranted because the presence of the firearm has the potential of facilitating another felony offense or another offense, respectively."

This 4-point scoring revolves around the notion that Mr. Stroud possession of the firearm found in the car accident case was potentially facilitating a drug trafficking offense. It is argued that for numerous reasons, this was not a drug trafficking situation. First, the amount of narcotics was just over half a gram, a

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVE, STE PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

drug quantity that is far more consistent with personal use than dealing.  Second,

Mr. Stroud was coming home from a construction job and was involved in a car

accident due to inclement weather.  Nothing in those facts suggests narcotic

trafficking.  Third, there are no controlled purchases, undercover informants, or

anybody else who would testify that Mr. Stroud sells drugs.  Fourth, although it has

been argued that there were lottery tickets found and that lottery tickets are used

to package small amounts of drugs for dealing, the fact remains that the extremely

small amount of narcotics found was not in a lottery ticket, that none of the lottery

tickets appeared to contain narcotic residue, and that Mr. Stroud plays the lottery,

like many other law abiding Michiganders.

The Sixth Circuit has recently opined on situations where the drug offense is

not a trafficking offense as follows:

> "If the other felony offense does not implicate drug trafficking—for instance,
> if the defendant merely possessed a controlled substance—the enhancement
> applies only if the government can establish that the firearm actually or
> potentially facilitated that offense.  To allow otherwise would render the
> distinction in the Guidelines commentary between drug trafficking and other
> felonies meaningless. In order to show that the firearm "facilitated" the
> other felony offense under the fortress theory, reviewing courts consider the
> proximity of the gun to the drugs, whether the defendant had an innocent
> explanation for the weapon (such as personal protection), the type of
> firearm, and whether the firearm was loaded.  Additionally, courts examine
> the accessibility of the gun, as well as the amount of drugs in proximity to
> the firearm, Ultimately, § 2K2.1 applies if the firearm had some
> emboldening role in a defendant's felonious conduct." *United States v
> Shanklin*, 924 F3d 905, 920 (6th Cir 2019)(internal quotations and citations
> omitted)

Applying this to the case at hand, the gun Mr. Stroud possessed had no

relationship to the small amount of narcotics found in the vehicle.  As will be

discussed in greater deal later in this memorandum, Mr. Stroud was the victim in

an armed robbery where he was shot seven times and nearly died.  The result of

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVE, STE PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

4

being victimized was his continued suffering from post-traumatic stress disorder. His fear of being shot and killed was the driving force behind his possession of a firearm on the day of the car crash.

### PART THREE-MR. STROUD'S LIFE AND CHARACTER

Mr. Stroud grew up in Southfield Michigan.  He was a good kid with drive and motivation to succeed.  Although his parents had divorced when he was seven, due to his father's substance abuse issues, he succeeded at school.  Sports was his passion and it paid off, with a basketball scholarship to University of Michigan Dearborn.  Unfortunately, because of injuries, he was unable to continue playing, which devastated Mr. Stroud.  He attempted numerous times to continue school, but losing basketball took away much of the passion for education.

This led to a time in Mr. Stroud's life where he made several poor decisions. The biggest of which was his involvement in a federal drug crime in Florida where he played a minor role in a narcotic deal to a confidential informant.  This resulted in a 30-month prison sentence.  Mr. Stroud has expressed to counsel that he went along for a ride that cost him 30 months.

After prison, Mr. Stroud had his ups and downs.  His ups included having his daughter Hunter, who he loves more than life itself.  He also began rehabbing houses and selling them with his father, which he enjoyed.  However, his life fundamentally changed in July of 2017 when he was shot.

Mr. Stroud describes to counsel that on the evening of the robbery, him and his then girlfriend India Holley[1] were pulling into his driveway at his home in Detroit.  Suddenly, an intruder jumped out at the side of the vehicle and ordered

---

[1] Ms. Holley provided a character letter which in part details this harrowing ordeal.

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVE, STE PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

Mr. Stroud out of the car.  Mr. Stroud tells counsel that it was his belief that the

robber wanted him to take him into the home.  Mr. Stroud reflects that at this

moment, he believed that the man wanted to take him and India into the home

and murder them.  Mr. Stroud then decided that if he was going to save India,

then he needed to stop the robber.

Mr. Stroud jumped out of the car and grabbed the gun.  A wrestling match

ensued where the assailant fired seven bullets into Mr. Stroud.  Lying on the

ground, the assailant then pointed the gun at his head and pulled the trigger one

last time.  By sheer luck, nothing happened, as Mr. Stroud believes the assailant

had unknowingly emptied the gun clip during the scuffle.  This incident left Mr.

Stroud permanently damaged, both physically and mentally.

Mr. Stroud relates to counsel that after his attempted murder, he was afraid

to go out into the world.  The only thing that somewhat alleviated this fear was to

have a gun.  When Mr. Stroud was charged in the first of these cases, he related to

counsel what had happened to him and why he now carried the gun.  After the

second case, it became very clear that Mr. Stroud had very serious underlying

issues stemming from his attack.

Mr. Stroud's pretrial services officer also recognized that it appeared Mr.

Stroud was suffering from post-traumatic stress disorder and was able to help get

Mr. Stroud into the proper treatment.  For the past few months, Mr. Stroud has

been receiving the right type of treatment through Rochelle Sims, his clinical

therapist at Team Wellness Center in Detroit.  (See Rochelle Sims Reports, which

will be filed separately as an exhibit under seal)  It appears that together, they

have a clinical plan that is in place to at least June of 2020.  Within the treatment,

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVE, STE PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

Mr. Stroud has revealed to Ms. Sims reoccurring flashbacks of being shot, nightmares every night, and fear of trigger events, such as fireworks.  Ms. Sims noted that Mr. Stroud does not sleep, has a poor appetite, decreased motivation, loss of interest, depression, hopeless and helpless, racing thoughts, irritability, and becoming easily agitated resulting from his being shot.

The therapy has had a tremendously positive effect on Mr. Stroud.  He relates to counsel that its working and feels that he is on the right track.

Viewing the many letters provided by family and friends, Mr. Stroud is a very important person to many people.  The letters speak to his abilities as a father, making sure his daughter gets to school every day.  His role as a son, helping his parents and grandparents in their times of need.  He is a positive role model to his younger family members.  He is a dear friend who has cultivated lifelong friendships.

## PART FOUR-THE 18 USC 3553(A) FACTORS

The goal of federal sentencing is to impose a sentence that is sufficient, but not greater than necessary based on the circumstances.  *US v Kimbrough*, 552 US 85, 92-93 (2007), citing 18 USC §3553(a)  While the guidelines provide an initial starting point for any analysis, the guidelines are not the only consideration and may not be given significant or special weight as to their reasonableness.  *Gall v US*, 552 US 38, 49-50 (2007)  Thus, the guidelines are merely advisory in the Court's determination of an appropriate sentence.  *US v Booker*, 543 US 220, 244 (2005)

Instead, the Court should consider all factors contained in 18 USC §3553(a) to determine whether a sentence requested by the party is appropriate.  *Gall*,

7

supra, 552 US at 49-50  If a sentencing judge should find that there exists

mitigating circumstances not adequately taken into account by the Sentencing

Commission or that the sentence should be reduced based on general policy or

case-specific grounds, then the sentencing judge may depart downward from the

advisory guidelines and fashion a sentence that best serves the interests of justice.

*US v Obi*, 542 F3d 143, 155 (6th Cir. 2008)

Specifically, 18 USC §3553(a) provides seven factors that the Court should

review in order to impose a sentence that is "sufficient, but not greater than

necessary."  These factors are:

(1)  the nature and circumstances of the offense and the history and
     characteristics of the defendant;
(2)  the need for the sentence imposed—
     (A)  to reflect the seriousness of the offense, to promote respect for the
          law, and to provide just punishment for the offense;
     (B)  to afford adequate deterrence to criminal conduct;
     (C)  to protect the public from further crimes of the defendant; and
     (D)  to provide the defendant with needed educational or vocational
          training, medical care, or other correctional treatment in the most
          effective manner;
(3)  the kinds of sentences available;
(4)  the kinds of sentence and the sentencing range established for—
     (A)  the applicable category of offense committed by the applicable
          category of defendant as set forth in the guidelines—
          (i) issued by the Sentencing Commission pursuant to section
              994(a)(1) of title 28, United States Code, subject to any
              amendments made to such guidelines by act of Congress
              (regardless of whether such amendments have yet to be
              incorporated by the Sentencing Commission into amendments
              issued under section 994(p) of title 28); and
          (ii) that, except as provided in section 3742(g) [18 USCS § 3742(g)],
               are in effect on the date the defendant is sentenced; or
     (B)  in the case of a violation of probation or supervised release, the
          applicable guidelines or policy statements issued by the Sentencing
          Commission pursuant to section 994(a)(3) of title 28, United States
          Code, taking into account any amendments made to such guidelines
          or policy statements by act of Congress (regardless of whether such
          amendments have yet to be incorporated by the Sentencing
          Commission into amendments issued under section 994(p) of title
          28);

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVE, STE PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVE, STE PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

(5)    any pertinent policy statement—
    (A)    issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
    (B)    that, except as provided in section 3742(g) [18 USCS § 3742(g)], is in effect on the date the defendant is sentenced.[;]
(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

**Nature and Circumstances of the Offense and History of Mr. Stroud**

Neither of the two cases here were started because of some other type of criminal activity. In both instances, Mr. Stroud was minding his own business and other factors resulted in the discovery of firearms. Both cases happened in the daytime, both happened in the public. Mr. Stroud was attempting to get a haircut prior to the events of the first case and he was coming home from working prior to his accident in the second. Both cases are intricately tied to Mr. Stroud's fears of being attacked again. It is because of these cases that Mr. Stroud is receiving proper treatment for his mental health issues.

The Court may grant a variance based on numerous issues found in this factor, including for mental condition, non-violent character, remorse, pre-sentence rehabilitation, family ties and responsibility, to name a few. All of these are present in this case. The reasoning behind why he committed these crimes, as well as his successful ongoing treatment of his post-traumatic stress disorder all come together to suggest a downward sentence variance is appropriate. And that is exactly what Mr. Stroud motions the Court to do, grant a variance below the bottom of the guidelines.

9

### A Non-Custodial Sentence Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides Just Punishment

This is an unusual situation where the underlying crimes were a direct result of Mr. Stroud's prior experience as the victim of a very serious crime.  A severe custodial sentence will effectively end Mr. Stroud's one-year treatment plan with Ms. Sims and he will be placed into a situation of confinement that is not necessary conducive to somebody suffering from post-traumatic stress disorder.

Recently, in our divided country, Congress was able to come together, in a bipartisan fashion, to pass criminal justice reform emphasizing rehabilitation as opposed to endless incarceration.  Although Mr. Stroud's charges are serious, the ultimate goal in a rehabilitation sentence is to ensure he gets the proper help to curtail him from committing future crimes.  It is with this mindset that a non-custodial sentence that focuses on his continued mental health treatment would meet all of these goals.

### A Non-Custodial Sentence Will Deter both Mr. Stroud and Others

Putting Mr. Stroud in prison won't stop his nightmares.  If anything, it will exacerbate them.  Because of the unusual nature of his cases, an incarceration-based sentence will have little deterring effect on Mr. Stroud or others.

### A Non-Custodial Sentence Will Adequately Protect the Public

As was previously discussed, the one thing that most Americans can agree on is that rehabilitation should be the emphasis of a sentence.  Mr. Stroud showed no aggressive behavior in either case and was only armed with a firearm out of a justifiable fear of being victimized again.  Given what he went through, this is not surprising.  The public is not at risk with Mr. Stroud serving a non-custodial sentence.

10

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVE, STE PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

### A Non-Custodial Sentence Will Allow Mr. Stroud to Receive the Proper Treatment for his Substance Abuse and Mental Health Issues

Mr. Stroud has already benefited from mental health treatment given to him as a result of this case.  Continuing this treatment makes logical sense.

### The Types of Sentences Available

Mr. Stroud could be incarcerated or given a non-custodial sentence.  A non-custodial sentence would allow for careful monitoring of his progress, all the while saving taxpayers the enormous amount of money required to incarcerate Mr. Stroud.

### Sentencing Guideline Police Statements

USSG §5K2.11, Lesser Harms, contemplates situations where "a defendant may commit a crime in order to avoid a perceived greater harm."  This is the exact situation we have here as Mr. Stroud committed his crimes because of his fear of being attacked again.  Although he knew it was wrong to have the guns, he did so because it was the only way he could continue to work and function in public.

### PART FIVE-CONCLUSION

Mr. Stroud is a remorseful person who is taking the right steps to ensure this never happens again.  He attends church, spends a great deal of time with his daughter, and wants to live a normal life.  Because of this case, he is getting the right treatment to help do this.   Mr. Stroud requests the Court continue this progress and sentence him to a sentence that allows him to continue this treatment and heal his wounds.

Respectfully submitted,

/s/*James W. Amberg*
AMBERG & AMBERG, PLLC
James W. Amberg P68564
Attorneys for Mr. Stroud
32121 Woodward Ave, Ste PH
Royal Oak, MI 48073
248.681.6255
248.681.0115 (fax)

Dated:  August 7, 2019

### Certificate of Service

I, James W. Amberg, attorney at law, certify that on August 7, 2019, I caused a copy of this document to be served upon the Court and United States Attorney via efile.

/s/  *James W. Amberg*
James W. Amberg (P68564)

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVE, STE PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

# Clinical Plan

## -filed under seal-

# Character Letters

7/29/2019

To whom it may concern,

Hello, my name is Juanita Straughter. I am writing this letter on behalf of Mr. Kevin Raymond Stroud. I have known Kevin for 15 plus years, and we share a beautiful four-year-old daughter named Hunter. Kevin is a wonderful father and partner who is very involved in his daughter's life. I am an emergency room registered nurse and current psychiatric nurse practitioner (PMH-NP) student. I work 12-16 hr. shifts sometimes, leaving Kevin to be Mr. Mom while I'm away. I say that with pride because our daughter doesn't miss a beat when I am consumed with work.  Our daughter is a brilliant, charismatic, well-mannered girl. She is wise beyond her years, speaks Spanish, and operates at a kindergarten level even though she is only in PreK. I can attribute most of her success to both Kevin and my parenting skills. Kevin is very hands-on with Hunter; he arranged his schedule so that she has never had to attend daycare. He is a very loving, responsible, and family-oriented individual. Over the last decade, I have witnessed his transition into the man he is today.

Within the last 2-3 years, Kevin has experienced some unfortunate events that have gone on to be life-changing. In 2017 he was shot multiple times in an attempted robbery/carjacking. Kevin was placed on life support, had to undergo several surgeries, and was hospitalized in the intensive care unit for over a week. Once released from the hospital, Kevin had to have intense physical therapy to learn how to walk again. Since the shooting, I have observed a change in Kevin's personality and outlook of life. I have noticed that he very rarely has an appetite, and often has trouble sleeping. He is constantly looking over his shoulder fearing for the safety of not only himself but the safety of his loved ones. Part of his paranoia is due to the fact that the Detroit Police Department (DPD) never caught or named a suspect or person of interest.

Recently, Kevin was caught with a firearm, and I can say with 100% certainty that he was not out to harm anyone. In all the years I've known Kevin, he has never had the desire to carry a weapon. This need for protection stems from almost losing his life. He is not perfect, but he is in no way a violent individual. Being caught with a weapon potentially takes him away from the one person who values him most, his daughter. Kevin and Hunter share a bond like no other. He has been with her since the day she was born. It is very rare to find a man who loves a child just as much as a mother does, and I found that in Kevin. Removing Kevin from his daughter will drastically change her day to day life. He is the one who makes her breakfast, lunch, and takes her to school most mornings because I work midnights. I am pleading with the court on behalf of my daughter, not to imprison Kevin. He would not benefit from jail time; what would benefit him most is counseling. Kevin needs help with what I believe to be PTSD. The shooting has made Kevin more of an introvert. He rarely wants to go out to crowded events such as carnivals, malls, etc. I am afraid that if Kevin goes away that Hunter will digress and hold this incident against him with growing resentment. At the tender age of four, she will not understand the circumstances that put her father in this predicament. To this day she has no knowledge of her father being harmed; she was not exposed to that reality, outside of accompanying him to physical therapy on

a few occasions. We have tried our best to shield her from the cruel realities of inner-city living.  Hence, the reason we chose to purchase a home in the suburbs of the city of Warren.

  In closing, I ask that during sentencing, you take into consideration the punishment handed down on Kevin ultimately impacts Hunter, a four-year-old child without a voice. As well-loved as our daughter is, there is no way that I can fill the void left in a child's heart and mind after having a parent taken away.

Sincerely,

Ms. Juanita Straughter

July 3, 2019                                    Donna Stroud
                                               18769 Alhambra Avenue
                                               Lathrup Village, MI  48076
                                               (248) 217-2275

The Honorable Arthur J.  Tarnow
United States District Court
Room 124
Theodore Levin U.S. Courthouse
231 W. Lafayette Blvd.
Detroit, MI 48226

Dear Judge Tarnow:

I am writing on behalf of, Kevin R. Stroud, who is before you for sentencing for felon in possession of a firearm.  I am Kevin's mother and I would like to present a picture of the Kevin I love.

I retired from UAW Solidarity House after a 30- year career in 2009.  Six years before I retired I returned to school and completed my studies in Vascular Ultrasound.  I have been teaching vascular ultrasound theory and practical applications at Carnegie Institute in Troy Michigan for the last 10 years.  I am a faithful parishioner at Sacred Heart Catholic Church under the pastorship of Father Norman Thomas.  My life partner of 29 years, Fred Neal, is a retired city of Detroit Fire Captain.

Kevin was raised with his older brother Craig, sister Kelli, and half sister Lauren in Southfield, Michigan along with cousins, aunts, and uncles.  Kevin's younger years include the typical family holidays, outings, and funny memories that we relieve when we get together.  Even though Kevin is a younger sibling his spirit and personality is that of an older brother.  He is one of the great souls of our family and he voluntarily became the problem solver and protector, interceding on behalf of all of us.   A prime example would be his assistance to me with the care of his grandmother,  great Uncle and Aunt whenever he could spare the time. (I had legal guardianship of Aunt Barbara before her death in late 2018)  Kevin  would cook meals, wash clothes, assist with toiletry, and of course, contribute to the usual "man bonding" discussions that the over-60 senior men in our family enjoy.

One of Kevin's great accomplishments is his daughter Hunter.  As a four year old she is a whirlwind, and her daddy is her best friend.  She can speak beginning Spanish; she can read early reader books; and she is pretty proficient with 1+1 and other easy addition.  This is primarily due to the loving parenting of Kevin and his partner Juanita, an emergency room nurse.

Your honor, Kevin is an honorable young man.  I know your responsibilities are great and you must render a decision.  I wish you had an opportunity to know this young man and see him as I know him.  He would be the enjoyable golf partner; the basketball and football partner; the young person you would enjoy mentoring. In this situation Kevin is a victim first due to the horrible shooting incident in 2017 causing him to be fearful for his life.  I know without any question he would never have been in possession of a gun if he did not fear for his life.  I certainly am not condoning the gun possession, but the question remains, what does a man do when he has to continue to function for himself and take care of his family despite this fear.   Again, I do not condone his action, but I am drawn to stories about John Kennedy and he is often quoted on what it is to be a man: "A man does

what he must – in spite of personal consequences, in spite of obstacles and dangers, and pressures…"

There has been no positive development in who shot Kevin, as well as there is no pill you can take to ease your mind after you have had a near death experience.   Kevin acknowledges his mistake and is remorseful.  He has apologized to me numerous times because he feels he has placed a burden on the family he has always protected.  He is a good, kind, and trustworthy young man who is very loved and respected by family and friends. In addition to our family, he is active with his church family at True Covenant Church under the pastorship of Pastor Barry L. Ginyard.

I am humbly asking for mercy and leniency when sentencing Kevin, it would be a disastrous hardship to our family to be without him.  I cannot think of any words to explain to my granddaughter that her father and best friend will not be around, and likewise, there are no words to comfort this 64-year old if he is not around.

Please know I am available at any time if you would like to speak with me.

Thank you for taking the time to read this.

Sincerely and Respectfully,



**Craig E. Stroud II**
Global Design Creative Strategist

The Coca-Cola Company
One Coca-Cola Plaza
Atlanta, Georgia  30313

T  470.809.4156
M 313.400.2884

To Whom It May Concern,

May name is Craig Stroud and I'm the older brother of Kevin R. Stroud, writing this testimony from Atlanta, Georgia where I reside.  It's been many years since I've brought myself to speak of my brother as younger or little as he's been my equal for many years (way before you'd expect a brother 10 years younger to find equal ground).  I love my brother and he is truly one of my best friends and he's earned my trust and respect as not only a brother but as a man.  While this is a very emotional and sensitive subject, I thought it more important to speak from a rational and factual based perspective. I've outlined several words along with actions that exemplifies my brother's character.

**Kind Hearted -** With me away he is the first person our friends and family call on to help with anything from helping to move, borrowing money, to odd jobs and handy man things, Kevin is the always available.   Kevin is usually the one to call and check on you even if there doesn't seem to be a need – and that's usually when we as human's need it most.

**Selfless** – While Kevin was in college working and trying to save money to buy a car, I fell on hard times, lost my job and was close to foreclosing on my home.  Kevin gave me his entire savings to catch up on several months of unpaid mortgage payments without a blink of an eye.  He'd been saving for over a year and because he played sports (university of Michigan Dearborn Basketball – working long hours wasn't always an option so it took longer to save and he gave selflessly).

**Devoted -** Family is everything to Kevin and to them he is devoted. Kevin finds himself here in this situation, because he's deferred his dreams/plans to move from Detroit to pursue other ambitions such as partnering with me on various business ventures to be close to family.   I believe he's sometimes torn between moving because our small close nit family all lives in Michigan and with the one of two brothers out of state, he feels the women in our lives need one of us.  Perhaps it's my time to move home and let him move to pursue other ambitions.  He helps daily with my grandmother who suffers from being old mostly but dementia doesn't help.

**Thoughtful -** every year I would attend my daughters homecoming at Western Michigan University - it became a tradition. One year I was unable to attend due to health reason, it was her senior year.   She was bummed out I couldn't attend as it had become a sort of tradition.  Unbeknownst to me or my daughter at the time, Kevin surprised her attending in my place - she said it made her 4 year homecoming streak a success.

**Faithful -** Kevin's faith has not waivered. Even through this trying time Kevin still continues to worship at his church. We talk daily and he shares his fears and how the shooting has impacted his day to day.  While he sometimes finds himself scared or paranoid doing simple things like going to the grocery store or filling a prescription, he carries on with faith and belief that he's protected by our lord and savior. I understand this to be difficult because I sometimes worry beyond my faith about him after what happened so I can only imagine the feeling he must have. We talk about this and I am proud that he carries on with purpose.

**Amazing Father -** Kevin's whole reason for being is to do what is right to the benefit of my niece Hunter. He is her primary care giver. He works his schedule around hers to ensure he can take her to and from school on a daily bases. This includes weekends as well, which is why his work schedule and time lines on some of the house projects tends to be prolonged. I marvel at how he's put his child first and it's given me an outlook on how I plan to change my parenting style I plan to take with my soon to be born son in September. I'm planning to leave corporate America to be an entrepreneurial consultant to Fortune 500 companies which will allow me to do as Kevin has done, carve out more time for family.

**Courageous -** after the shooting, even with fear and doubt for his safety Kevin went back to rehabbing houses. He did this all at approximately 75 to 80% rehabilitated.

**This is my brother, Kevin R. Stroud, Kind Hearted, Selfless, Devoted, Thoughtful, Faithful, Amazing Father and Courageous.**

Thank you for time and this consideration,

Craig E. Stroud II

Classified - Unclassified

July 2019

To whom it may concern,

 From a young age I was told that the man of the house should be a leader, provider, and protector. Kevin Stroud has been all of the above and more. My uncle's loyalty, love, perseverance, and dedication has made me him into the great son, father, brother and uncle he is today. Our family is quite small and we cherish the times we all have together. Kevin is definitely the glue to our family and it shows whenever we are all together.

 My father moved out of state for career opportunities, Kevin hasn't missed a beat! When my dad is hundreds of miles away I know that my uncle was just one call away and shortly after he would be on the scene to help me. Helping me even when I was away at school, the calls and the visits didn't stop. It sounds cliche but to the women in our family he is a superhero. From my great grandmother Honey, to my grandma, to my aunts and cousins we all know who to call. Kevin has always been there to tackle every problem of ours head on and to handle it with pride. The past few years i've seen a new side of him. He took on the roll of a caregiver for the elders in our family. My great grandmother has a form of dementia, she became very ill few years ago and every step of the way Kevin was there to assist his grandmother. Assisting her with her move from Florida back here to Michigan he has been the go to guy when it comes to helping her. Not only does he help with my great grandmother, my great aunt and uncle who have recently passed knew they could count on him as well. He has taken on this heavy roll of being there for everyone while raising a daughter as well. The love he has for his family shows.

 I personally feel to take him away from such a tight knit family would do more damage to us then it would him. There are multiple people in the family depending on him and lives would be drastically changed if he was not there. If I could please ask that this letter serves as a purpose to prove that Kevin Stroud is beyond love by his family and he serves a mighty purpose of being free for not just his self but for his entire family.

Kind regards,

Destiny Stroud

July 20, 2019

Dear Judge Tarnow as well as any additional interested parties,

My name is Kelli Stroud.  I am writing on behalf of my younger brother, Kevin Stroud.  He is being charged as a felon in possession of a firearm.  This charge is so very opposite of who my brother really is.  Judge, if you could please take a quick look at his character, as well as the root of our family.  To know my brother is to love him.

A bit of background about who I am.  I have always wanted to teach in the public-school system, and after much consideration I decided to finally pursue it.  I completed my course work in Education at Wayne State University.  I have just transitioned into the realm of education as of January of this year.  Prior to my transition, I worked for the Union for almost 19 years, and I enjoyed all my years there.

I would like to give you a glimpse at who my brother is, and what he means to our family.  Although "Kev" (as we all refer to him as) is our baby brother, it has always felt as though he was my *other* older brother, so I refer to him as my little "big" brother.  Our oldest brother Craig is 44, I am 41, and Kevin is 36.  We have always had a bond that was not only that of siblings, but friendships as well.  It is such a blessing to have this, as having siblings does not always result in bonds and friendships.  This bond has allowed us to share laughs together, be candid with each other, and hold each other accountable for our relationships with our family.  It is an absolute beautiful feeling to know that if Kev calls me its because he wants to talk to his sister friend, and vice versa, I can call my brother friend.

Kev is a gentleman who walks by faith and is in love with the simple things in life.  Kev, next to our Mom is always the one who is trying to see what the "game plan" is for getting together.  He is always the life of the party, cracking jokes, dancing, and just having the kind of fun that creates the best memories.  Kev's personality, his wit, his charm, his work ethic, and entrepreneur spirit are always at the forefront of him. It's just who he is.  He is the kind of guy that is just there to help make things run

smoothly.  When it comes to our mother, who is a "retired worker" in the literal since of the term, Kev is always "Johnny on the spot". Kev is always saying to our mom, "you have to just relax sometimes Ma".  Our mother, after retiring from the Union after 30 years of service, went into the cardiovascular field.  Mama is now teaching it and she is also facilitating new recruits into the field.  Watching our mother work hard is definitely what made my brothers and I appreciate, practice, and understand the importance work ethic.  Kev loves doing things for our mother.  He is always taking Mama flowers, taking her car to get something fixed, doing something around her yard, simply trying to make it easier on her.  He understands the importance of taking care of the oldest generation in our family.   Our grandmother, whom we call Honey, also a retired teacher and school counselor appreciates the young man that Kevin is.  He is never too busy, nor too far to drop off a fish dinner, or move a piece of furniture (even if it is being moved for the fifth time) or taking her to a doctor's appointment.  Kevin gave our great Uncle Bebe, and Aunt Barbara who both recently passed on, the same attentiveness.  Kevin has always loved and is consistently keeping up with the oldest generation in our family but is *very* hands-on with his daughter. He is so proud and is always vividly telling us something new and funny that Hunter did or did not do.

Kevin is the kind of father that does not distinguish a "mom's job" from a "father's job" because he has always done everything for her.  He does it all from giving Hunter her bath for the evening, picking her clothes out for school, to doing her hair for school, to actually taking her to school. Now Judge, she may have Minnie Mouse puffs in her hair (LOL).  It makes me so proud to see how involved and hands-on with the day to day preparations that come with taking care of our children.  He enjoys talking, playing and guiding her in only a style that he can.  He is also the disciplinarian and authoritarian.   Kids, especially the youngest generation need this kind of authoritarian nature in order to be productive people in society. Kevin and I always talk about how much different our kids are versus how we were as kids.  We agree that they

need much more guidance from us then we needed as kids.  Although our kids are smart, they have so many more distractions in life, and they have so many more outlets that can influence them.  He redirects Hunter when she comes home with the not-so-appropriate, but natural things that kids do or say at school.  Kevin understands that this foundation starts with him, which is the very reason he is front and center.  We were always raised and taught by our mother that class, respect, and morals in addition to hard work are values that can never be bought but are instilled at a birth and on up.  Kevin was talking to Hunter before she was even born.  Kevin did not talk to Hunter in the "babyish voice".  It was more conversation-like, hence the reason she is so smart.  If you were to hear a conversation between him and Hunter, you would think there was an adult in the room.   This, as well as the friendship, bond and partnership between Kevin and Juanita (Hunter's Mother) make raising her a joy, a blessing.  These bonds extend to my two daughters, as well as our niece (our oldest brothers' daughter).

Although Hunter (4), my daughters (Donna-Morae 6, and Brayla 5), our niece (Destiny 24, and our oldest brothers' daughter) are young, they are learning the same important morals and values.  They have the unique blessing to be learning it together, as well as from the examples that my brothers and I have learned together.  My daughters and Destiny love "Uncle Kevin".  Although we visit each other frequently, my girls get so excited because he brings so much fun energy.

I could go on about my brother, but I just wanted to give a glimpse at the type of person that he is.  He is no criminal, nor is he a threat to anyone. He is just the best son, grandson, father, brother and friend that a person would be blessed and fortunate to have in their life.  It is very emotional, and it makes me sad when I think about the possibility of my brother missing from any of our lives for any amount of time.  I ask that you please consider the void that would be missing from our family and especially his daughter.  She is so young, and she is so very aware of Kev's presence every day.  She would be so affected by any absence from her day to day schedule.  As much as she loves to visit and "spend the night

at "TiTi Kelli's" as she calls me, she still wants to know what time Daddy is coming to get her.  Hunter will stop in the middle of all fun she is having and want to FaceTime my brother.  This would devastate Hunter.  My brother is the victim.  We almost lost him to some coward who tried to rob him, without the thought or regard for his life.  My brother has only been fearful ever since July 9, 2017.  Earlier this exact same day we'd just had a blast at my daughter's birthday party.  It was a traumatic for him as well as for our whole family.  We know that all too many times a life is lost for things that are so senseless.  My brother by *no* means, is a violent person, and has never had a need or reason to carry or possess a gun.  He is just a man, who almost lost his life.  I, nor anyone else who has never been at the barrow of a gun and felt defenseless will ever know what that feels like.  I ask Judge that you would please, please take everything that I have shared into account when you make your decision.  This would crush our family.  My brother does not need rehabilitation, as he was the victim.

Thank you, thank you for taking the time to read through our families' letters, and for your consideration.

Respectfully Submitted,

*Kelli Stroud*

In my 26 years of being Kevin Stroud's baby sister, I've never been asked to describe his character. As I reflect on the question now, its possible I was never asked because no one ever needed to ask me. I've always been first to boast about him to anyone who would listen. And as I reflect further, I think I always subconsciously thought he knew this. But for a change I want to direct this to him.

Kevin – I'll just start from the beginning. I was born and you played with me like I was your own little baby doll! (And with pictures showing you dressed me up as one too!) I was a happy baby and I believe that had everything to do with how included you kept me since I lived in a separate household. To the point that as I began grade school, I didn't even realize that we fell into the category as "half siblings." I entered middle school, attending the same school you did. And not a thought crossed my mind that it would matter 10+ years later! I remember sitting down into my one of my classes for the first time. After class, she pulled me to the side to ask if I had a brother named Kevin Stroud. I said yes. She immediately got this grin on her face and said "Oh my god! Come with me!" She raced me to another teachers room and when entering with me she goes "This is KEVIN STROUD's little sister!!" The two teachers instantly began to share stories about how funny you were, how good you were at basketball, how much everyone loved you when they had you in their class and so on. It was the first time (and certainly not the last) that I was so proud to be your sister. I wanted everyone to know and I wanted to continue to carry out that standard!! After that I'm pretty sure every first day of school in middle school following, I asked all my teachers "Did you know my brother Kevin Stroud?" Those who said yes, were automatically my favorites.

Through these days, you were who I always wanted to hang out with. If I arrived at a family activity before you, "Where is Kevin?" was my first question. Followed by "Do you know when he'll be here?" and "I want to call him!" You would come through the door and I would jump for joy right onto your waist. And not let go for a solid 3 minutes. I would beg to go with you just to the store when the family sent you on an errand run. These would be the times where you would tell me how you knew all my childhood celebrity heartthrobs. Convincing me that you had all inside information on where they would be when they came in town for concerts. But mostly this is where we had our true talks. I could talk to you about anything in a car ride. You taught me the importance of setting the example for our niece, Destiny, since me and here are so close in age. You taught me the importance of loyalty to family. You taught me to commit in doing things that make me happy. You taught me how a guy is supposed to approach me, if they are considering dating me. You taught me about respect, not only for others, but respect for myself. You taught me how high my standards are supposed to be. These lessons instilled trust, it built a bond between us and made me understand how much you loved me and you would do anything to make sure, I was okay and happy.

I didn't realize how important establishing this tie between us was before I got to high school. I entered high school seeing other girls without the same guidance, without the same talks, without the same protection as I received. Not so much due to not having a brother but simply due to no one having a someone like you in their corner. By the time I got to college, moved a bit further away, involved with more cheerleading, obtained internships, it was more important for me to stay connected with you because life got harder. I was going through complicated relationships, making difficult decisions, trying to navigate the "coldness" of the world when things used to be so easy. A visit to see you was always worth it. You being a phone call away meant everything. You became more involved with knowing my friends, who became family. You treated them as your own sisters. So much that even they felt the bond of how much you care and look out for us. Even though it was "cool" to me to have you hang out with

us, to you it was about being around. You knew it would make me happy, while also doing your big brother duty to make sure I was safe.

As I start becoming into my late 20's, I need you more than ever. The world isn't as cut and dry as I thought. The decisions are getting harder because the stakes are so much higher. We've accomplished so much but that means we have a lot to lose. I'm living in Texas and it's the furthest I've ever been from you and the rest of our family. Being this far away and getting that phone call that you almost got your life taken, was one of the scariest things I've ever experienced. How could I be so far? So useless when all you have done was be there for me? And not to mention, how dare someone attempt to take away one of the best men I have in my life???

I have no words to express how grateful I am that you're still here, with me. With Dad, with Craig. With Kellie. With Destiny. With Hunter. Craig's wedding was the best time of my life because we were all present. Together. But I guess that's the point of this letter, right? To explain why I need you HERE with us. Living with us. Creating these memories that will last a lifetime.

To whom it may concern – I love my big brother. He's a great person. One of the best people I will ever know.  I knew how much of an impact he's made on my life as a child. But looking ahead, I know how much more I will need him. His nieces will need him, his DAUGHTER will need him. There was a possibility we all could lose him forever. Please let us continue to cherish our time with him. Kevin Stroud should be with his family. Shedding his guidance, his lessons and his laughs. Please allow that to happen.

Best,

Lauren Stroud

**Michigan First**
**CREDIT UNION**

27000 Evergreen Rd
Lathrup Village, MI 48076

Dear Honorable Judge Arthur Tarnow,

My name is India Holley and I am writing this letter on behalf of Kevin Stroud. I would like the court to know that I am here today because Kevin Stroud saved my life. On July 9, 2017 after returning to our home from going out to dinner Kevin and I were ambushed in our driveway. It was dark, I couldn't see anyone but I could hear him say "DON'T MOVE!". With quick thinking and heroism Kevin jumped out of the car to get the shooter away from me and to try to disarm him. Kevin ended up being shot 7 times. I can still hear him screaming while lying on the ground, screams that I will never forget. Kevin was hospitalized for 9 days and ended up having to have emergency surgery. Upon being discharged from the hospital Kevin immediately began physical therapy because he was determined to learn how to walk again. With motivation and determination Kevin made a speedy recovery physically. Kevin still struggles mentally from the incident resulting in sleepless nights and little to no appetite knowing that the person who committed this crime was never caught. Kevin has found constructive outlets to help with his anxiety by becoming active in his church and by seeking psychiatric counseling. I am asking the court today for forgiveness and understanding towards Kevin. Kevin was carrying a gun for protection purposes. He wanted to be able to protect himself seeing that he was not able to do so on July 9, 2017.

Respectfully yours,

India J. Holley

800.664.3828     **365Live**
our 24-hour call center     MichiganFirst.com

July 25, 2019

Joseph Steele
4900 Windhaven Pkwy
Lewisville, TX 75056

Dear Honorable Judge Tarnow,

My name is Joseph Steele and I am writing you this letter in regards to Kevin Stroud.  Before I speak about Kevin, I will give you a brief overview of myself.  I am originally from Detroit Michigan, and grew up specifically in Southfield Michigan.  After graduation, I went on to continue my studies at MSU, and Kevin went on to attend Lansing Community College for a while. I ultimately completed my degree at Tennessee State University.  I received my degree in Business Administration with a concentration in Supply Chain Management.  I am now working as a category Specialist for an Oil and Gas company her is Texas.

I met Kevin in middle school where we both were attending at the time. We both have older brothers that were good friends and we naturally connected and formed a friendship. Growing up with Kevin as a friend was a phenomenal experience, and we have now formed a bond that is unbreakable. Blood couldn't make us any more related, where 20 plus years of friendship has turned into a brotherhood for us.  He has the heart of a giant and is willing to do anything for anyone.  He will literally give you the shirt off of his back if he had to. His willingness to give, and help others are natural qualities that he continues to show.  Even though we live in different states, we continue to be a part of each other lives. We have been through ups and downs, the good and the bad, and Kevin has stood strong to provide whatever it was that I needed.  When my oldest brother was murdered in December of 2006, Kevin was there and still is there to this day to help myself, my brother, and my family through our difficult time. He is the Godfather to my oldest niece Mia who he loves very much.  He himself is a great father, brother, and Son.  Our Families have been around each other for many years, and it has been nothing short of a blessing to have him in my life.  He has been a blessing to everyone around him in his own special way.

When Kevin was shot multiple times in July of 2017, it not only shook my world, but it tremendously turned Kevin's world upside down. It is something I will never forget with the incident occurring prior to my birthday. Kevin now suffers from paranoia, and rightfully so with the traumatic experience and ordeal he went through and survived.  Although Kevin is a person who will always own up to his mistakes and take responsibilities for his actions, please understand that the firearm that Kevin possessed was strictly for his own protection, as the individual(s) were never caught and arrested who attempted to take his life. I believe with every ounce of my being that Kevin would never carry a firearm with the intent to do harm, malice, or in the commission of any crime. I ask that you see the real Kevin Stroud, which is the loving, caring, resilient, determined to succeed and be a productive citizen that each person who is around him is able to see.  I ask that you please consider this letter when sentencing him and understand that Kevin is able to do a lot of good, be a great friend, brother, father, and son as a free person as opposed to being incarcerated.

Sincerely,


Joseph Steele

Kinnus Paul

30264 Southfield Rd apt 268

Southfield, MI 48076


July 30, 2019


RE: Kevin Stroud


To the Honorable Judge Tarnow,


My name is Kinnus Paul and I'm a Unit Leader at Fiat Chrysler Automobiles.  I played college football at Western Kentucky University where I received my Bachelor's degree in Business.   I am writing on behalf of Kevin Stroud.  We have been close friends for more than 15 years.  In this time he has proven to be of a fine and good character.  He's a dedicated father and devoted family man.  As one of my close friends he has given his time to mentor my son and others in sports.  Kevin's recent offense is unexpected.

 Kevin had a lapse in judgment and made a bad decision when we were younger.   He came home and worked tirelessly to vindicate his name.  In one fail swoop all that work came to a halt when he was attacked in the back yard of his own home.  Safety became a large part his conversation at that point. He never let that thought leave his mind.  He expressed remorse and a strong desire to address the personnel issues at the heart of this matter.  I believe Kevin has every intention of improving since, he has already begin seeking help by seeing a therapist and attending church.  Regardless of what barriers he will face, I have confidence that he developed the skills needed to avoid making such bad decisions.

Kevin has thus far shown a steadfast and resolute demeanor in moving past this mistake in a constructive and successful manner.  It is my hope this letter regarding Kevin Stroud and his case will act as a positive and contributing factor when the court considers this matter.

Sincerely,



Kinnus Paul